**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>United States</u>

      v.                            Case No. 19-cr-76-1-PB
                                         Opinion No. 2020 DNH 009

<u>Robert Corleto</u>

## <u>MEMORANDUM AND ORDER</u>

Roberto Corleto has been indicted by a grand jury for one count of sexual exploitation of a minor under 18 U.S.C. §§ 2251(a) and (e) and one count of transportation of child pornography under 18 U.S.C. §§ 2252A(a)(1) and (b)(1). In his motion to suppress (Doc. No. 30), Corleto seeks to suppress all evidence seized by FBI agents when they executed a search warrant on March 19, 2019 for the residence located at and vehicles registered to 315 Elmwood Drive, Hudson, New Hampshire. He also seeks to suppress statements he made to law enforcement agents during the execution of the search warrant and later that evening at the Hudson Police Department. For the reasons that follow, I deny Corleto's motion to suppress.

## I.  BACKGROUND

### A.  Relevant Facts

The facts in question are drawn from FBI Special Agent ("SA") Timothy DeMann's affidavit in support of the application for a search warrant, his affidavit in support of a complaint and arrest warrant, Corleto's affidavit in support of the motion to suppress, and testimony provided by SA DeMann, Corleto, and Corleto's wife, Nicole ("Ms. Corleto") at a motion hearing held on December 19, 2019. After reviewing the affidavits and the hearing testimony, I find SA DeMann's testimony to be credible and accept as true his version of events where they differ from those of other witnesses.

#### 1.  Search Warrant

On March 19, 2019, Magistrate Judge Andrea Johnstone granted SA DeMann's request for a warrant to search 315 Elmwood Drive, which included not only the residence but also two vehicles registered to the address. Search and Seizure Warrant, Gov't Ex. 2, Attach. A, Doc. No. 36. In his affidavit in support of the search warrant, SA DeMann explained that an undercover FBI agent ("UC") communicated with an individual ("the target") on the messaging application KIK Messenger ("KIK") and that the UC witnessed the target engage in sexually explicit interactions with a minor he referred to as his "12-year-old slave" who "does

whatever he asks her to do." DeMann Aff. in Supp. of Appl. for
Search Warrant, Gov't Ex. 1, Doc. No. 35 at 7-9 ¶¶ 22-27.

After sending "an emergency disclosure request to KIK for
subscriber identification and IP access logs associated with"
the target, the FBI determined that the target had engaged in
the incriminating exchanges with the UC by using an iPhone on a
Comcast IP address. Doc. No. 35 at 9 ¶ 29. Further investigation
established that the Comcast IP address was assigned to the
account of Ms. Corleto at 315 Elmwood Drive, where Corleto also
resides. Doc. No. 35 at 9 ¶¶ 30-31. Two vehicles are registered
to this address: "a 2016 blue Chevy Equinox" to Ms. Corleto and
"a 2001 white Ford F150 pickup" to Corleto. Doc. No. 35 at 9 ¶
31. In support of his request to search the vehicles, SA DeMann
averred that, based on his professional experience and training,
"[t]hose who distribute, transport, receive, or possess child
pornography" tend to keep the evidence of their crime in a
variety of secure locations, "including in outbuildings and
motor vehicles." Doc. No. 35 at 11-12, 14 ¶¶ 34b-c, 36.

The search warrant for the residence and vehicles
authorized the search and seizure of all computers and
electronic records "that were or may have been used as a means
to commit the offenses" of production, possession, and
distribution of child pornography. Attach. B, Doc. No. 36. The
warrant defined the term "computer" broadly, to include not just

traditional laptop or notebook computers but also tablets and
smart phones, among other items. Attach. B, Doc. No. 36. The FBI
executed the search warrant on March 19, 2019 at 6:30 pm and
seized multiple cell phones and other electronic devices. Doc.
No. 36.

2.   Seizure of the iPhone

As the FBI arrived at the condominium complex to execute
the search warrant, SA DeMann stopped the Corletos in the Chevy
Equinox as they were about to exit the complex's parking lot.
Tr. of Suppression Hr'g ("Tr.") 16:1–4. Ms. Corleto was in the
driver's seat and Corleto in the front passenger seat. Tr. at
17:7–8. SA DeMann identified himself and "asked . . . Corleto to
exit the vehicle[,]" Tr. 18:1–2, although Corleto was already in
the process of exiting the Equinox,[1] Tr. 63:1–3, 20–21. He then
"asked [Corleto] if he had a cell phone on him,"[2] Tr. 18:4.
Corleto responded that he did, Tr. 18:16, and he produced an

---

[1] Corleto asserted that SA DeMann "motioned to [him] to get out
of the vehicle" while the agent approached, and that is what
prompted him to begin to exit the Equinox. Tr. 94:21–24; accord
Tr. 113:10–12 ("As [SA DeMann] was walking toward the vehicle,
he signaled me to get out of the vehicle. So as I started
getting out of the vehicle, he met me at the door . . . .").

[2] Corleto claimed that SA DeMann "did not ask [him] if [he] had a
phone" because "it was in [his] hand[,] meaning the agent could
see it and had no need to ask. Tr. 113:18–114:1. SA DeMann
recalled asking Corleto if he had a cell phone while Corleto was
getting out of the Equinox but before he spotted the phone in
Corleto's hand. Tr. 157:17–20.

iPhone, which was in his hand.[3] He then proceeded to "open" his phone, compare Tr. 31:13-15 (according to SA DeMann, Corleto used his thumbprint) with Tr. 95:12-18 (according to Corleto, his phone did not need to be unlocked to give SA DeMann "access to it"), which lacked any "pin, passcode, or fingerprint . . .

---

[3] SA DeMann struggled throughout the hearing to recall exactly where Corleto's phone was located when Corleto stepped out of the Equinox and when SA DeMann asked whether Corleto had a phone on his person. See Tr. 30:21-24 ("I don't know on his person whether he had it – I can't remember if he had it on, in a pocket or – he did not reach into his vehicle."); Tr. 64:23-24 ("Again, I don't know if he had it in his pocket or if he had it in his hand. He had it on his person."). SA DeMann's original position was that, after he asked Corleto about his cell phone, Corleto removed the phone from his pocket. Redacted Interview Report, Gov't Ex. 3, Doc. No. 34-1 at 1; accord Tr. 67:1-4 (refreshing his memory on cross-examination by reviewing his contemporaneous report). In his testimony at the motion hearing, however, SA DeMann changed his position, stating that Corleto "may have actually had [the cell phone] in his hand when he was in the vehicle . . . ." Tr. 29:11-12; accord Tr. 29:19-20 ("My best memory [is] that [Corleto] had [the cell phone] . . . in his hand.") At one point during his testimony, SA DeMann said he did not recall Corleto reaching into a pocket or removing the phone from the Equinox as he stepped out of the vehicle. Tr. 29:21-22; 30:8-11, 22-24. Corleto testified that his phone was in his left hand while he was in the Equinox and that it remained in his hand as he stepped out of the vehicle until SA DeMann took it from his hand. Tr. 95:9-96:8. Corleto has been consistent on this point, stating the phone was in his hand in his affidavit accompanying the motion. Def's Aff. in Supp. of Mot. to Suppress Evid. Seized Pursuant to Search Warrant and to Suppress Statements Made at Time of Seizure and Thereafter, Doc. No. 31 at 1 ¶ 5. SA DeMann ultimately testified that the phone was in Corleto's hand as Corleto got out of the Equinox, and he admitted that he was mistaken in his report. Tr. 157:11-14, 21-24; 158:2-3, 20-24.

to 'unlock' the device."[4] United States's Notice Regarding the
Def.'s Cell Phone, Doc. No. 43 at 1. This sequence of events —
from stopping the car to opening the iPhone — happened in a
matter of seconds. Tr. 18:19. Once Corleto opened his phone, SA
DeMann seized it pursuant to the warrant. Tr. 31:22–23; 82:3–6,
18–20.

   3.   Corleto's Statements

   Corleto made statements to law enforcement agents on two
occasions: first, at the scene as officers seized the car and
searched the residence, and second, at the Hudson Police
Station.

      a.   **Statement at the Scene**

   Immediately after seizing the iPhone, SA DeMann took
Corleto aside, Tr. 34:7–12, and "explained to him that [the FBI]
had a search warrant for the [Equinox] and his other vehicle and
his house related to child pornography," Tr. 32:2–6. Agents

---

[4] In his testimony, SA DeMann first recalled asking Corleto to
unlock his cell phone, followed by Corleto replying that his
phone did not have a passcode, but "he could [unlock] it with
his thumbprint. Tr. 18:7–9. Then, SA DeMann recalled that
Corleto unlocked the phone at the same time SA DeMann asked him
to do so. Tr. 31:5–15. By contrast, Corleto testified that his
"phone did not have a password," Tr. 95:13, and that he did not
need to use his thumbprint to unlock it for the agent, Tr.
106:8–10; see Tr. 95:16–18; 96:15–16. The government has since
confirmed that Corleto's phone was not equipped with any locking
feature, meaning anyone who picked up the phone could activate
and open it by "depress[ing] the 'home' button." Doc. No. 43 at
1.

prepared to search the Equinox while SA DeMann and Corleto spoke. Tr. 32:15–17. "No one was in uniform except for" the local law enforcement officers in a marked police cruiser. Tr. 28:5–6. Instead, the agents were wearing "FBI raid jackets" to identify themselves. Tr. 28:7, 12–14. "[N]o one had guns drawn." Tr. 28:17. As the search process got underway, no one handcuffed Corleto or restrained him in any way.[5] Tr. 35:1–2. Meanwhile, Ms. Corleto was speaking with an agent near "the front driver's side . . . of the vehicle . . . ." Tr. 35:14–16.

After SA DeMann "stepped away for a few moments, back to the vehicle, . . . Corleto motioned [him] over," Tr. 33:7–8, 12, and "told [SA DeMann] that everything [the agent] was looking for was on his phone,"[6] Tr. 36:6–7. Shortly thereafter, agents

---

[5] Corleto asserted that he was "told . . . to go stand at the back of the [Equinox]," Tr. 97:10–11, and then did not move for about "ten or fifteen minutes" until agents "told [him and his wife] to go into the house," Tr. 98:5–8. Although he testified that SA DeMann only told him that he was not under arrest between seizing the phone and going to search the condominium, Tr. 115:1–13, he stated in his affidavit that he "was told repeatedly that [he] was not in custody," Doc. No. 31 at 2 ¶ 9 (internal quotation marks omitted); accord Tr. 116:22–25 (pointing out the discrepancy between Corleto's testimony and his affidavit on cross-examination). Regardless, he felt that "the circumstances were such that [he] was not free to leave." Doc. No. 31 at 2 ¶ 9. SA DeMann did not recall discussing with the Corletos at that time whether the Corletos were in custody or free to leave. Tr. 75:15–19.

[6] No one denies that these words left Corleto's mouth. Corleto merely challenges the admissibility of a statement he made while a stressful and upsetting scene unfolded before him and his

began searching the condominium. Tr. 39:6-16. During the search of his residence, Corleto voluntarily reiterated this statement to SA DeMann multiple times. Tr. 39:21-40:10; 120:9-10, 13-14. Given Corleto's admissions, the sensitive nature of the investigation, and the crowding in the small condominium, Tr. 41:16-25; accord Tr. 76:12-14 ("[T]hroughout the time that we were in [the condominium, Corleto] kept wanting to reiterate to me that . . . it was all on the phone, and I'll tell you everything . . . ."), SA DeMann asked Corleto, "[W]ould it be okay if we went down to the Hudson Police Department and spoke there,"[7] Tr. 42:7-8; accord Tr. 76:7-11 ("I don't remember word for word . . . but . . . I asked [Corleto] if he would come down

_____

wife. See Doc. No. 31 at 2 ¶ 10 ("We were frantic and confused."); see also Doc. No. 31 at 2 ¶ 13 ("There were statements illegally elicited from me and my wife during interviews after the unlawful seizure of the motor vehicle and our persons."). To that end, he testified that he "just got nervous . . . and said . . . what you're looking for is on the phone," Tr. 99:5-7, because agents at the scene had his wife over the hood of a law enforcement vehicle to frisk her, Tr. 99:4-5, 14-17, and he "wanted it to stop," Tr. 100:7-8. Ms. Corleto did not testify to such a search of her person when she was on the stand, Tr. 100:9-13, and I do not find Corleto's version of events credible on this point.

[7] Corleto testified that SA DeMann "told" him that they were going to the station, Tr. 108:23-25; 109:3-4, not that he was asked to go, Tr. 108:8-9. He claimed that he "asked if [he] had to go, and [he] was told that [he] did have to go." Tr. 109:13-14.

to the Hudson Police Department to talk further."), to which Corleto "said that would be fine," Tr. 42:10.

When Corleto asked whether "he could take his truck," Tr. 42:12, SA DeMann said no, because the truck needed to be searched pursuant to the warrant, Tr. 42:13–14. Instead, he asked Corleto, "[W]ould it be okay if you rode with me in my vehicle?" to which Corleto replied, "[O]kay." Tr. 42:14–15. Then, SA DeMann drove his vehicle to the station, with Corleto "in the front seat next to [SA DeMann]," Tr. 42:21, and "the other interviewing agent . . . in the backseat," Tr. 42:22–23. Corleto "was not handcuffed" during the trip, Tr. 42:21–22; accord Tr. 110:17–18, and he voluntarily rode in SA DeMann's vehicle,[8] see Tr. 43:2–17.

### b.   Statements at the Station

At the police station, SA DeMann made a video recording of the interview. See Tr. 44:4–5, 16–17. He later testified under oath that the video was not stopped "at any point during the interview[.]" Tr. 45:21–22.

Based upon the timestamp in the video recording, Corleto remained in the interview room at the Hudson police station for

---

[8] Corleto claimed he had no other choice but to go in SA DeMann's vehicle, "[b]ecause that's how they told [him he] was getting" to the station. Tr. 110:6–7.

just over one hour.[9] Gov't's Obj. to Def.'s Mot. to Suppress, Gov't Ex. 5, Doc. No. 34-3. During this time, Corleto spoke with Agent DeMann and three other law enforcement officers: Special Agent Kim Blackwood ("SA Blackwood"), Hudson Police Department Detective Adam Lischinsky ("Lischinsky"), and Special Agent Jill Laroe ("SA Laroe"). Tr. 44:10—13.

At the start of the interview, Corleto entered the room and sat in a chair facing the video recording device. Doc. No. 34-3 at 7:12:06 pm. SA DeMann then entered the room with SA Blackwood, and they both sat across the table from Corleto with their backs to the camera. Doc. No. 34-3 at 7:14:35 pm. SA DeMann and SA Blackwood wore casual clothing (i.e., not uniforms), and neither displayed a weapon. Doc. No. 34-3 at 7:14:35 pm. After they entered the room, SA DeMann and SA Blackwood left the door open. Doc. No. 34-3 at 7:14:35 pm. Throughout the entirety of the interview, none of the interviewers raised their voices, nor did any interviewer speak aggressively or adopt an aggressive physical posture.

---

[9] Although the record reflects that this interview took place on March 19, 2019, the timestamp on the video recording identifies the date as March 20, 2019. Considering this discrepancy, I use the times displayed in the video solely for the purpose of identifying events in the video for citation purposes, without making any specific findings of fact as to the date or the precise time of day that those events occurred.

After introducing SA Blackwood, SA DeMann told Corleto, "As we explained before, and as the detective explained to you, this is audio-video recorded, okay? You are not under arrest. You are not in custody. At any point, if you want to leave, you're more than welcome.[10] I'll drive you back to your house. No problem. Okay?" Doc. No. 34-3 at 7:14:45–7:15:05 pm. SA DeMann testified that, had Corleto ended the interview or tried to leave the interview room and station, he would have been free to do so. Tr. 48:17–25.

The two agents questioned Corleto for roughly twenty minutes, during which time Corleto made numerous self-incriminating statements, which are the subject of this motion. Doc. No. 34-3 at 7:15:05–7:34:49 pm. During this questioning, Corleto made reference to "sitting in the police station," and SA DeMann again told him, "You're not in custody and you're free to go at any point, as we have explained." Doc. No. 34-3 at 7:31:30. At a break in his questioning, SA DeMann exited the room, leaving the door open. Doc. No. 34-3 at 7:34:53 pm. SA Blackwood remained in the room with Corleto. Doc. No. 34-3 at 7:34:53 pm. Although SA Blackwood asked Corleto a few questions

---

[10] Corleto testified that he was neither told he was free to leave the station nor under the impression he could leave or refuse any order from law enforcement. Tr. 110:19–21; 111:3–22; 112:1–4, 13–17. He did, however, understand that he was not under arrest. Tr. 111:19–25; 121:16–18.

during the time she was alone in the room with Corleto, the majority of their conversation centered around Corleto's questions to SA Blackwood about the next steps in the investigation and small talk about Corleto's experience as an EMT. Doc. No. 34-3 at 7:34:53-7:38:50 pm.

Det. Lischinsky then entered the room, leaving the door open, and took the chair previously occupied by SA DeMann. Doc. No. 34-3 at 7:38:50 pm. He wore a uniform polo shirt with his name and a badge printed on it, as well as a belt with a badge, handcuffs, and other equipment attached to it. Doc. No. 34-3 at 7:38:50 pm. Although the video is not entirely clear, he does not appear to be carrying a weapon. Doc. No. 34-3 at 7:38:50 pm. Det. Lischinsky asked Corleto why he had previously changed his last name and posed several additional questions about Corleto's activities on KIK, leading Corleto to make additional self-incriminating statements (for example, Corleto discussed knowingly soliciting sexual photographs from a twelve-year-old girl and admitted to having similar interactions with a "handful" of others). Doc. No. 34-3 at 7:38:50-7:43:19 pm.

SA DeMann later returned to the room and took his earlier seat. Doc. No. 34-3 at 7:43:19 pm. Det. Lischinsky then moved to stand in the doorway, partially obstructing it as he leaned against the doorframe. Doc. No. 34-3 at 7:43:31 pm. Det. Lischinsky remained in the doorway for approximately one minute

while Corleto discussed his name change and military service. Doc. No. 34-3 at 7:43:31-7:44:20 pm. During this time, the conversation was relatively lighthearted and both Det. Lischinsky and SA Blackwood laughed. Doc. No. 34-3 at 7:44:03 pm. As Det. Lischinsky left the room, he closed the door behind him. Doc. No. 34-3 at 7:44:20 pm.

The door remained closed with Corleto, SA DeMann, and SA Blackwood in the room, for approximately five minutes. Doc. No. 34-3 at 7:44:20-7:49:13 pm. During this time, the conversation centered around Corleto's questions to the agents about what would happen next. Doc. No. 34-3 at 7:44:20-7:49:13 pm. SA DeMann once again told Corleto, "Like I said, you can leave at any time. Any time you want to stop asking, or we want to stop asking, that's it. Go home. I'll give you a ride." Doc. No. 34-3 at 7:46:20-7:46:36 pm. Additionally, in response to SA DeMann stating, "If there's anything else you need to let us know, please let us know," Corleto replied, "It's all right there on the phone." Doc. No. 34-3 at 7:48:32-7:48:40 pm. SA DeMann and SA Blackwood then exited the room, leaving Corleto alone with the door closed for approximately twenty minutes. Doc. No. 34-3 at 7:49:13-8:07:55 pm.

SA DeMann returned to the room with SA Laroe to explain the next steps in the investigation and prepare to bring Corleto home. Doc. No. 34-3 at 8:07:55-8:14:29 pm. During this

discussion, the door remained open. Doc. No. 34-3 at 8:07:55-8:14:29 pm. SA DeMann again told Corleto, "Depending upon what happens with me and the prosecutor, that could prompt an arrest down the road. OK? So, just so you're prepared for that, it's not happening tonight. You're not - You're going home." Doc. No. 34-3 at 8:08:50-8:09:00 pm. With that, the interview ended, and SA DeMann offered to drive Corleto "to a friend's house or a family member's" house, Tr. 46:6-9, but Corleto "said he wanted to go home . . . ." Tr. 46:21-22. So, SA DeMann drove him home, Tr. 46:24-25, again, with Corleto in the front seat, Tr. 47:2.

**B.** **Motion to Suppress**

On November 25, 2019, Corleto moved "to suppress all things seized pursuant to a search warrant covering . . . the residential property located at 315 Elmwood Drive, Hudson, New Hampshire, as well as any vehicles registered to that address . . . any items intended to be utilized as evidence, and evidence derived" from the search. Mot. to Suppress Evid. Seized Pursuant to Search Warrant and to Suppress Statements Made at Time of Seizure and Thereafter with Incorporated Mem. of Law ("Motion to Suppress"), Doc. No. 30 at 1. The motion included all electronic devices seized during the execution of the warrant and all statements made by the Corletos. Doc. No. 30 at 2. A hearing on the motion was held on December 19, 2019.

Corleto has presented three grounds for suppressing a wide range of evidence: two under the Fourth Amendment and one under the Fifth Amendment. First, he argues that the warrant is invalid because it fails to meet the Fourth Amendment's nexus and particularity requirements. Tr. 4:7–5:20; see also Doc. No. 30 at 4–10. Second, even if the warrant is valid, Corleto argues that SA DeMann exceeded the scope of the warrant when he seized Corleto's iPhone. Tr. 6:1–7; see also Doc. No. 30 at 10.

Corleto's Fifth Amendment argument centers on two sets of statements: first, those made at his residence during the execution of the search warrant, and second, those made at the station immediately afterward. Tr. 8:6–14. He maintains that he was in custody at all relevant times and should have been given Miranda warnings, and so any statements he made were not voluntarily given and must be suppressed as "fruit of the poisonous tree." Doc. No. 30 at 17 ¶¶ 18–19; 21 ¶ 25.

Objecting to Corleto's motion, the government maintains that the warrant was valid and that all searches and seizures fell within the scope of the valid warrant. United States's Obj. to Def.'s Mot. to Suppress Evid., Doc. No. 34 at 1–2, 7–12. The government also asserts that, even if the seizure of Corleto's iPhone exceeded the warrant's scope, the seizure was still valid because Corleto consented to handing it over to SA DeMann. Tr. 6:13–21; see also Doc. No. 34 at 12. Finally, the government

maintains that, because Corleto was never in custody, agents were not required to read him his Miranda rights and any statements Corleto gave were voluntary. Doc. No. 34 at 2, 13–15.

## II.  ANALYSIS

### A.  Fourth Amendment

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause is a "nontechnical conception" that relies on "common-sense conclusions about human behavior" and "the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (citations omitted). "Probable cause exists whenever the circumstances alleged in a supporting affidavit, viewed as a whole and from an objective vantage, suggest a 'fair probability' that evidence of a crime will be found in the place to be searched." United States v. Clark, 685 F.3d 72, 76 (1st Cir. 2012) (citing Gates, 462 U.S. at 238). "All that is needed is a 'reasonable likelihood' that incriminating evidence will turn up during a proposed search." Id. (citing Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003)). "The inquiry is not

whether 'the owner of the property is suspected of crime' but rather whether 'there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.'" United States v. Roman, 942 F.3d 43, 51 (1st Cir. 2019) (quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978)). In determining whether such a reasonable likelihood exists, the statements of a law enforcement agent about how persons engaging in a particular form of criminal activity often serve as "a factor" that the magistrate judge may "weigh in the balance." See United States v. Rivera, 825 F.3d 59, 64 (1st Cir. 2016) (citing United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987)).

      1.   Validity of Warrant

Corleto challenges the validity of the search warrant on two grounds. First, he alleges that SA DeMann's affidavit does not support a finding of probable cause that evidence of the alleged offense would be found in the Chevy Equinox registered to Ms. Corleto (the "nexus" argument). Next, he alleges that there was not probable cause to support a search of all the devices encompassed by the warrant's broad definition of "computer" and "records" (the "particularity" argument). For the reasons that follow, neither argument provides grounds for invalidating the warrant.

### a. Standard of Review

A district court "must give 'considerable deference to reasonable inferences the issuing magistrate may have drawn' from the facts set out in the affidavit supporting the . . . application for the search warrant, reversing only if the affidavit contained no 'substantial basis for concluding that probable cause existed.'" United States v. Gonzalez-Arias, ___ F.3d ___, No. 18-1085, 2019 WL 6974631, at *2 (1st Cir. Dec. 20, 2019) (quoting United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)). "In a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause." United States v. Greenberg, 410 F.3d 63, 67 (1st Cir. 2002) (quoting United States v. Barnard, 299 F.3d 90, 92-93 (1st Cir. 2002)).

### b. The Nexus Argument

The analysis of the validity of a warrant can be divided into two steps: inquiring whether there was probable cause to establish "that (1) a crime has been committed — the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched — the so-called 'nexus' element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (citing Zayas-Diaz, 95 F.3d at 111). In the nexus inquiry, "common sense says that a connection with the search site can be deduced 'from the type of crime, the nature of the

items sought,' plus 'normal inferences as to where a criminal would hide' evidence of his crime." Rivera, 825 F.3d at 63 (quoting Feliz, 182 F.3d at 88); accord United States v. Wilder, 526 F.3d 1, 6 (1st Cir. 2008) (including law enforcement "affidavit's information about the habits of child pornography collectors" in the probable cause analysis).

Corleto does not dispute that there was probable cause to suggest that a crime had been committed. Tr. 4:3–4. Rather, he argues that the agent's affidavit did not provide probable cause to suggest a reasonable likelihood that evidence of the crime would be found in a vehicle registered to Ms. Corleto. Tr. 4:7–15. It is not entirely clear whether the defendant objects to the inclusion of any vehicles in the warrant, or merely that the inclusion of Ms. Corleto's vehicle was overbroad. Tr. 128:16–134:10. Neither argument, however, provides grounds to invalidate the warrant.

SA DeMann's affidavit establishes an unambiguous link between the alleged offender's KIK username and a particular IP address. Aff. in Support of a Compl. and Arrest Warrant, Doc. No. 1-1 at 9. The affidavit links the IP address with a Comcast account registered to Ms. Corleto at the defendant's physical address. Doc. No. 1-1 at 9. It also establishes that the target used an iPhone to communicate with the UC. Finally, the affidavit identifies two vehicles that are registered to that

physical address: a Ford F150 pickup registered to Corleto and a
Chevy Equinox registered to Ms. Corleto. Doc. No. 1-1 at 9. The
agent supplemented these factual links with this statement: "In
my training and experience, I know it is not uncommon for
individuals to keep [child pornography] in multiple locations
within their premises, including in outbuildings and motor
vehicles." Doc. No. 1-1 at 14.

Taken together, the statements in the affidavit provide
more than enough evidence to justify the issuance of the search
warrant for Corleto's residence and his and Ms. Corleto's motor
vehicles. The chain connecting the KIK account to a Comcast IP
address and the IP address to Corleto's residence could hardly
be clearer. See United States v. Grant, 218 F.3d 72, 76 (1st
Cir. 2000) (upholding the validity of a warrant to search the
defendant's home based on parallel evidentiary chain). Because
at the time the warrant was issued it was not clear which
occupant of the Corleto's residence used the suspect KIK
account, it was permissible for the warrant to authorize a
search of all of the occupants' devices. See United States v.
McLellan, 792 F.3d 200, 213-14 (1st Cir. 2015) (upholding
validity of warrant to search electronic devices of three
roommates living in a single-family dwelling where evidence of
child pornography was linked to an IP address and "every

internet connection established from any of the occupants'
computers would trace back to the same IP address").

The magistrate judge was also entitled to rely on SA
DeMann's statements to support her probable cause determination.
See Rivera, 825 F.3d at 66 ("[T]he Federal Reporter is teeming
with First[ ]Circuit opinions . . . saying that 'a law
enforcement officer's training and experience may yield insights
that support a probable cause determination.'") Specifically, SA
DeMann's statement that it is not uncommon for users of child
pornography to keep their collections in motor vehicles is
consistent with common sense and supplies probable cause to
include the Corleto's vehicles in the warrant. See United States
v. Clark, Crim. No. 10-62-P-S, 2010 WL 4365562, at *12 (D. Me.
Oct. 27, 2010) (upholding the validity of a warrant to search
all vehicles registered to a family residence where there was
probable cause to believe the crime of animal cruelty had been
committed at that residence and the supporting affidavit alleged
that "live or dead animals or records related to animals might
have been housed in vehicles kept on the property"), adopted by
2010 WL 4973516 (D. Me. Dec. 2, 2010), aff'd on other grounds,
685 F.3d 72 (1st Cir. 2012); United States v. Wilder, Crim. No.
04-10217-GAO, 2005 WL 1106922, at *5 (D. Mass. May 6, 2005)
(upholding validity of warrant to search residence and vehicle
registered thereto where there was probable cause to believe

defendant had accessed child pornography in the residence and the supporting affidavit provided details about the general habits of child pornography collectors), aff'd on other grounds, 526 F.3d 1 (1st Cir. 2008). There was, therefore, a reasonable likelihood that the iPhone used to commit the alleged offense, or some other electronic device containing evidence of the offense, would be found in Ms. Corleto's Equinox.

### C. The Particularity Argument

"The Fourth Amendment . . . does not set forth some general 'particularity requirement.' It specifies only two matters that must be 'particularly describe[ed]' in the warrant: 'the place to be searched' and 'the person or things to be seized.'" United States v. Grubbs, 547 U.S. 90, 97, 126 S. Ct. 1494, 164 L. Ed. 2d 195 (2006) (alteration in original). The First Circuit has recognized two categories of cases on "particularity," cases concerned with "whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take," United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999) (citation omitted), and those concerned with "whether the category as specified is too broad in the sense that it includes items that should not be seized," id. (citation omitted). Corleto's argument that the warrant's definitions of "computer" and "records" are overbroad falls into the latter category and

is precisely the argument that the First Circuit rejected in
United States v. Upham.

The warrant in Upham authorized the seizure of "[a]ny and
all computer software and hardware, . . . computer disks, [and]
disk drives" to search for and seize "[a]ny and all visual
depictions, in any format or media, of minors engaging in
sexually explicit conduct . . . ." Id. (alteration in original).
The court observed that the seizure and off-site search of this
broad category of items was

> [a]s a practical matter . . . about the narrowest
> definable search and seizure reasonably likely to obtain
> the images. A sufficient chance of finding some needles
> in the computer haystack was established by the
> probable-cause showing in the warrant application; and
> a search of a computer and co-located disks is not
> inherently more intrusive than the physical search of an
> entire house for a weapon or drugs.

Id. To the extent that the warrant in this case differs from the
warrant in Upham, it does so by defining "computer" and
"records" in greater detail and includes, in its definition,
items such as flash drives, smartphones, and tablets, which
either did not exist or were not in common use when the Upham
warrant was issued in 1997. While the warrant in this case
enumerates more searchable devices than the Upham warrant, it is
still (considering technological developments of the past two
decades) "about the narrowest definable search and seizure
reasonably likely to obtain the images." See id. Other district

courts in this circuit have applied Upham and reached the same
conclusion. See, e.g., United States v. Farlow, Crim. No. 09-38-
B-W, 2009 WL 4728690, at *7 (D. Me. Sept. 29, 2009) ("In the
First Circuit, Upham remains the law."), aff'd, 681 F.3d 15 (1st
Cir. 2012); United States v. Crespo-Rios, 623 F. Supp. 2d 198,
202-03 (D.P.R. 2009) (examining a warrant authorizing the search
of "computer equipment, digital, and magnetic storage devices,
and other digital media" and concluding that "[s]ince the
warrant suggested that the digital media to be seized was
related to a specific criminal activity, it cannot be classified
as a generic classification that would go against the
particularity requirement of the Fourth Amendment"), rev'd on
other grounds, 645 F.3d 37 (1st Cir. 2011); United States v.
Habershaw, No. CR. 01-10195-PBS, 2002 WL 33003434, at *7 (D.
Mass. May 13, 2002) (upholding, under Upham, validity of warrant
authorizing search of "any and all computer hardware, software,
files, data, photographs, to include but not limited to; all
floppy disks, hard drives, photo imaging drives, for any and all
computer directories, subdirectories, files, information,
records, data contained on all floppy disks, hard drives, data
banks and all other magnetic, or optical computer media").
Corleto has provided no authority suggesting that I should
deviate from Upham. Because I see no reason to do so, I conclude

that the warrant was sufficiently particularized and valid under
the Fourth Amendment.[11]

### 2. Seizure of iPhone from Corleto

Corleto next argues that SA DeMann exceeded the warrant's
scope when he seized the iPhone from Corleto's hand as he
emerged from the vehicle. Corleto bases his argument on case law
suggesting that a warrant authorizing a search of a particular
place ordinarily does not authorize the search of persons found
at the place to be searched. See Ybarra v. Illinois, 444 U.S.
85, 94-95, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979) (holding that
a search warrant for a tavern and its bartender did not extend
to a search of one of the bar's patrons present at the time the
warrant was executed, even if "the police have a 'reasonable
belief' that such persons . . . 'may be concealing or carrying
away the contraband'"); United States v. Di Re, 332 U.S. 581,

---

[11] Even if I were to find the warrant invalid, the seizure of
Corleto's iPhone would still be proper under the Leon good faith
exception. United States v. Leon, 468 U.S. 897, 920, 104 S. Ct.
3405, 82 L. Ed. 2d 677 (1984) (holding that exclusion does "not
further the ends of the exclusionary rule . . . when an officer
acting with objective good faith has obtained a search warrant
from a judge or magistrate and acted within its scope"). 
Corleto's iPhone plainly is a seizable device under the warrant.
Moreover, the warrant is neither "so lacking in indicia of
probable cause as to render official belief in its existence
unreasonable," nor "so facially deficient . . . that the
executing officers cannot presume it to be valid." United States
v. Woodbury, 511 F.3d 93, 99 (1st Cir. 2007) (internal quotation
marks omitted) (quoting United States v. Owens, 167 F.3d 739,
745 (1st Cir. 1999)).

587, 68 S. Ct. 222, 92 L. Ed. 210 (1948) (noting that a search warrant for a home or a car does not extend to a search of all persons found in the home or car).

Although I accept the case law Corleto cites, I am ultimately unpersuaded by his argument for two independent reasons. First, the seizure of the iPhone was lawful because SA DeMann was able to determine that Corleto was holding an item the warrant authorized him to seize without having to conduct a search of his person. Thus, the case law he cites is simply inapplicable. Alternatively, even if SA DeMann's actions could be viewed as a search of Corleto's person, the search was the result of a valid consent to search because Corleto produced the phone in response to SA DeMann's request, and the totality of relevant circumstances makes it clear that his consent was freely given. See United States v. Coombs, 857 F.3d 439, 449 (1st Cir. 2017) (describing consent to search standard).

## B.    Fifth Amendment

Corleto also contends that his statements to SA DeMann and the other agents, both at his home and at the Hudson Police Station, should be suppressed because he was not administered Miranda warnings. There is no dispute that Miranda warnings were not administered. The government contends, however, that warnings were not required under the circumstances in which Corleto made the statements in question.

The Fifth Amendment to the United States Constitution
provides that "[n]o person . . . shall be compelled in any
criminal case to be a witness against himself . . . ." U.S.
Const. amend. V. Based on this constitutional prohibition on
compelled self-incrimination, "'[t]he Supreme Court developed
the Miranda rules as a prophylactic measure to dissipate the
coercion inherent in the custodial interrogation setting, with a
goal of ensuring that any statements made by a suspect are
'truly the product of free choice' and consistent with the Fifth
Amendment . . . ." United States v. Molina-Gomez, 781 F.3d 13,
21 (1st Cir. 2015) (internal quotation marks omitted) (quoting
United States v. Vazquez, 857 F.2d 857, 861 (1st Cir. 1988)).
"It is well established that Miranda warnings must be
communicated to a suspect before he is subjected to 'custodial
interrogation.'" United States v. Li, 206 F.3d 78, 83 (1st Cir.
2000) (citing United States v. Ventura, 85 F.3d 708, 710 (1st
Cir. 1996)). This means that "[b]oth 'custody' and
'interrogation' must be present to require Miranda warnings."
Molina-Gomez, 781 F.3d at 22.

As to the "interrogation" prong, Miranda does not cover
"[g]eneral on-the-scene questioning as to facts surrounding a
crime or other general questioning of citizens in the fact-
finding process . . . ." Miranda v. Arizona, 384 U.S. 436, 477,
86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Moreover,

"[v]olunteered statements of any kind are not barred . . . ." Id. at 478. Thus, no interrogation occurs "[i]f an individual simply walks into a police station and announces that he just robbed a bank . . . ." United States v. Diaz-Rosado, 857 F. 3d 116, 122 (1st Cir. 2017) (citing Miranda, 384 U.S. at 478). "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 297 (1980). "The 'functional equivalent' of questioning is 'any words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Davis, 773 F. 3d 334, 339 (1st Cir. 2014) (omission in original) (quoting Innis, 446 U.S. at 301). "[T]he mere fact that a police officer may be aware that there is a possibility that a suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation." Id. (alteration in original) (internal quotation marks omitted) (quoting United States v. Taylor, 985 F.2d 3, 8 (1st Cir. 1993)).

The "custody" prong is satisfied when an individual is "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (per curiam) (internal quotation marks omitted) (quoting Miranda, 384

U.S. at 444). "Determinations about Miranda custody begin by examining all of the 'circumstances surrounding the interrogation' and asking whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010) (alteration in original) (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)). The First Circuit Court of Appeals has identified four factors that, among others, guide whether a set of circumstances amounts to custody: "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011) (internal quotation marks omitted) (quoting Ventura, 85 F.3d at 711).

      1.   Statements at the Scene

As an initial matter, Corleto's statement that what the agents were looking for was "all on [his] phone" is clearly a volunteered statement that is not subject to Miranda. By Corleto's own admission, this statement was not made in response to any question by SA DeMann or any other agent. Tr. 117:13-19. In fact, Corleto testified that he beckoned SA DeMann over to him in order to make this statement. Tr. 117:5-16. This

statement is plainly admissible as it is not the product of
interrogation.

Because Corleto's motion is otherwise imprecise as to what
statements at his home he seeks to suppress, it is not clear
whether any additional statements made at his residence were the
product of an interrogation. It is, however, quite clear that
Corleto was not in custody. Corleto's own driveway, parking lot,
and home, are clearly "familiar or at least neutral
surroundings." Hughes, 640 F.3d at 435. Although there were
roughly twelve agents present, Tr. 60:16-19, nothing in the
record suggests that anyone other than SA DeMann spoke with
Corleto at this time. Corleto was even left alone at times. Tr.
117:1-3. He was never in handcuffs, nor did any agent display a
weapon at any point. Tr. 119:19-22. He was told, "shortly after
[the agents] were searching through the vehicle," that he was
not under arrest. Tr. 114:14-115:12. Corleto was not in custody
during any conversations he had with SA DeMann at the car or in
his home. Any statements he made at that point are, therefore,
not suppressible for a failure to administer Miranda warnings.

    2.   Statements at the Station

Although Corleto was no longer on familiar or neutral
ground for his interview at the police station, the evidence
still clearly shows that he was not in custody for Miranda
purposes. Corleto was driven to the station in the front seat of

SA DeMann's car, and was not in handcuffs or locked in. Despite
Corleto's testimony that throughout his entire interaction with
law enforcement, he was only told once (as the vehicle search
was conducted) that he was not under arrest, the video of the
interview shows that he was told on at least four additional
occasions that he was not under arrest, not in custody, and free
to leave at any time. See Doc. No. 34-3 at 7:14:45-7:15:05 pm,
7:31:30 pm, 7:46:20-7:46:36 pm, 8:08:50-8:09:00 pm. Corleto was
not in handcuffs or otherwise restrained. The door remained open
and no agent obstructed Corleto's path to the door throughout
the vast majority of questioning by the agents. Although there
were, at times, three agents in the room, this never occurred
until after Corleto made the self-incriminating statements he
seeks to suppress. When the interview was over, SA DeMann drove
him home. Taken together, these factors clearly demonstrate that
Corleto was not in custody for Miranda purposes during this
interview. See United States v. Hinkley, 803 F.3d 85, 90 (1st
Cir. 2015) (holding that defendant was not in custody where he
"arrived at police station voluntarily[,] . . . . was
interviewed by only one police officer[,]" and was told twice
during "the interview that he was 'free to leave'"). The cordial
nature and relatively brief duration of the interview also
support the conclusion that this interrogation was non-
custodial. See United States v. Guerrier, 669 F. 3d 1, 6 (1st

Cir. 2011) (holding that suspect was not in custody where the atmosphere was "relatively calm and nonthreatening" and the interview lasted "a relatively short time."). Whether Corleto subjectively believed he was free to leave is immaterial, as the determination of whether custody exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned." Stansbury, 511 U.S. at 322. The interrogation of Corleto was objectively not custodial, and the agents were under no obligation to administer Miranda warnings to him. That they did not do so is, therefore, not a reason to suppress Corleto's statements.

## III. **CONCLUSION**

For the reasons explained above, I deny the motion to suppress (Doc. No. 30).

**SO ORDERED.**

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

January 23, 2020

cc:  Elliot M. Weinstein, Esq.
     Mark G. Miliotis, Esq.
     Paul J. Garrity, Esq.
     Anna Z. Krasinski, Esq.